IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| JENNIFER ANN DIAZ, | ) | CASE NO.  5:15-cv-02543 |
| | ) | |
| Plaintiff, | ) | MAGISTRATE JUDGE |
| | ) | KATHLEEN B. BURKE |
| v. | ) | |
| | ) | |
| COMMISSIONER OF SOCIAL | ) | |
| SECURITY, | ) | |
| | ) | **MEMORANDUM OPINION & ORDER** |
| Defendant. | ) | |

Plaintiff Jennifer Ann Diaz ("Plaintiff" or "Diaz") seeks judicial review of the final

decision of Defendant Commissioner of Social Security ("Defendant" or "Commissioner")

denying her applications for social security disability benefits.  Doc. 1.  This Court has

jurisdiction pursuant to 42 U.S.C. § 405(g).  This case is before the undersigned Magistrate

Judge pursuant to the consent of the parties. Doc. 14.

For the reasons set forth herein, the Court **AFFIRMS** the Commissioner's decision.

**I.  Procedural History**

On June 22, 2012, Diaz protectively filed for Disability Insurance Benefits ("DIB") and

Supplemental Security Income ("SSI").[1]  Tr. 14, 188-193, 194-201, 214.  Diaz previously

applied for disability benefits and, on May 24, 2012, received a partially favorable decision.  Tr.

62-84.  In the May 24, 2012, decision, Diaz was found disabled from February 20, 2010, through

January 16, 2012.  Tr. 67.  Further, it was determined that, as of January 17, 2012, medical

---

[1] The Social Security Administration explains that "protective filing date" is "The date you first contact us about filing for benefits. It may be used to establish an earlier application date than when we receive your signed application."  http://www.socialsecurity.gov/agency/glossary/ (last visited 1/18/2017).

improvement occurred and Diaz was determined to be able to perform substantial gainful activity from that date through the date of the May 24, 2012, decision.  Tr. 67-68, 77.

In her June 22, 2012, applications, Diaz alleged a disability onset date of January 18, 2012 (Tr. 14, 188, 194, 214), and alleged disability due to asthma, depression, sleep apnea, endometriosis, allergies, carpal tunnel in right hand, and bladder problems.  Tr. 85-86, 109, 137, 151, 214.   Diaz's applications were denied initially (Tr. 137-150) and upon reconsideration by the state agency (Tr. 151-162).   Thereafter, she requested an administrative hearing.  Tr. 165-166.   On April 4, 2014, Administrative Law Judge Yelanda Collins ("ALJ") conducted an administrative hearing.  Tr. 31-61.  On April 24, 2014, the ALJ issued a decision denying benefits.  Tr. 11-30.  In her decision, the ALJ acknowledged the prior ALJ decision but concluded that she was not bound by that decision due to the introduction of evidence that was new and material to the determination of disability.[2]  Tr. 14.   Also, in her decision, the ALJ determined that Diaz had not been under a disability from January 18, 2012, through the date of the decision.  Tr. 14, 24.  Diaz requested review of the ALJ's decision by the Appeals Council.  Tr. 9-10.  On October 8, 2015, the Appeals Council denied Diaz's request for review, making the ALJ's decision the final decision of the Commissioner.  Tr. 1-6.

## II. Evidence

### A.    Personal, vocational and educational evidence

Diaz was born in 1982 and was 32 years old at the time of the hearing.  Tr. 35, 188, 194.  Diaz was married with two teenage children.  Tr. 36.  They all lived in their house together.  Tr. 36.  Diaz obtained her GED in 2001.  Tr. 37, 218.  She had vocational training as a nurse's assistant.  Tr. 37-38, 218.  She obtained an associate's degree in medical assisting in 2008.  Tr.

---

[2] This finding is not challenged by Diaz.

38, 218.  Diaz last worked as a medical assistant for a chiropractor in 2010.  Tr. 38.  Her work

there included checking in patients, filing charts, and picking up patients who required

transportation to the medical office.  Tr. 39.  She also has past work experience as a nurse's aide,

which involved taking care of patient's daily needs, e.g., dressing, feeding and companionship.

Tr. 38-39.

**B.  Medical evidence**[3]

**1.  Medical records**

Diaz treated with her pulmonologist Alan Rudick, D.O., with Mercy Pulmonary, Critical

Care & Sleep Medicine Physician, since April 2009.  Tr. 257.  Diaz saw Dr. Rudick for various

conditions, including asthma and obstructive sleep apnea.  Tr. 257, 292.   As of July 2011, Diaz

was using the following medications to treat her asthma – Symbicort, Singular, Xolair injections,

Spiriva and she was using Albuterol with her nebulizer machine.  Tr. 292.   In July 2011, Dr.

Rudick noted that a pulmonary function study done on June 20, 2011, showed essentially normal

flow rates.  Tr. 292.

In September 2011, Diaz saw Amy Skabar, a nurse practitioner with Dr. Rudick, for

follow up regarding her asthma and sleep apnea.  Tr. 333.   Diaz had been receiving Xolair

injections every two weeks for her asthma and she reported that the treatments had helped her

breathing tremendously.  Tr. 333.  Following a sleep study, it was determined that Diaz did have

sleep apnea.  Tr. 333.  She was using a CPAP machine to treat her sleep apnea and reported that

she was wearing the CPAP 6-7 hours each night and feeling less tired during the day.  Tr. 333.

Ms. Skabar's impression was that Diaz had severe persistent asthma but it was under good

---

[3] The medical evidence summarized herein pertains primarily to Diaz's respiratory problem because her sole
argument relates to environmental limitations associated with that impairment.

control with Xolair and inhaled corticosteroid and her sleep apnea was being effectively treated with the CPAP.  Tr. 333.

Diaz saw Ms. Skabar on January 10, 2012, and continued to report good results from the Xolair treatments.  Tr. 331.  Diaz complained of an occasional cough and indicated that she did have small exacerbations of her asthma at that time of the year.  Tr. 331.  Diaz had not had to use prednisone and had not had any emergency room visits for her breathing.  Tr. 331.  On examination, Diaz's respiratory rate was 16 and her O2 (oxyhemoglobin) saturation on room air was 98%.  Tr. 331.  Ms. Skabar noted signs of oral candidiasis.  Tr. 331.  Diaz was advised to continue her medications and Ms. Skabar also prescribed nystatin oral suspension for the oral candidiasis.  Tr. 331.

In February 2012, Diaz saw one of the physicians at Aultman Family Practice ("Aultman") for a follow up regarding anxiety.  Tr. 499.  She also reported some fatigue.  Tr. 499.  Diaz reported that she was using the CPAP machine and felt like a new person but was still slightly fatigued.  Tr. 499.  On examination, Diaz's respiratory rate was 18 (unlabored) and her chest and lung examination was normal.  Tr. 500.  During a March 2012 follow-up visit for anxiety and fatigue, on examination Diaz's respiratory rate was 18 (unlabored) and her chest and lung examination was normal.  Tr. 388.

On May 9, 2012, Diaz saw Dr. Rudick for a follow-up visit.  Tr. 289, 330.[4]  Diaz reported that, "overall her respiratory status [had] been reasonably stable" but she had had "some recent, mildly increased chest tightness" and "a cough" with clear-colored sputum.  Tr. 289.  Diaz reported that she was tolerating her medications well.  Tr. 289.  On examination, Diaz's respiratory rate was 16 and her O2 saturation was 99% on room air.  Tr. 289.  Diaz's lungs were clear to percussion and auscultation.  Tr. 289.  Dr. Rudick noted a sinus arrhythmia.  Tr. 289.

---

[4] The May 9, 2012, record appears in the administrative record twice.  Tr. 289 and Tr. 330.

Dr. Rudick indicated that Diaz's asthma was reasonably well controlled.  Tr. 289.  He prescribed nystatin oral suspension for a five day period.  Tr. 289.  He advised Diaz to let him know if her chest tightness persisted.  Tr. 289.  Dr. Rudick was going to hold off on systemic corticosteroids at the time.  Tr. 289.

On August 24, 2012, Diaz had pulmonary function testing performed.  Tr. 413-414.  The results were normal.  Tr. 414, 593.  Following her pulmonary function testing, Diaz saw Dr. Rudick for follow up on August 27, 2012.  Tr. 535, 593.[5]  Overall, Diaz indicated her respiratory status had been stable.  Tr. 593.  She noted, however, being fatigued and slightly short of breath with exertion.  Tr. 593.  On examination, Diaz's respiratory rate was 14 per minute and her O2 saturation was 98% on room air.  Tr. 593.  Dr. Rudick observed signs of oral candidiasis.  Tr. 593.  Diaz's lungs were clear to percussion and auscultation.  Tr. 593.  Dr. Rudick recommended another prescription for nystatin for five days.  Tr. 593.  He also recommended that Diaz continue on her current medical regimen.  Tr. 593.  He planned to follow up with her in 2-3 months and noted that, if Diaz was doing well, he was going to consider downscaling her therapy and decreasing her corticosteroid dosage and Symbicort.  Tr. 593.  Dr. Rudick also recommended that Diaz register for pulmonary rehab.  Tr. 593.

On November 8, 2012, Diaz saw a physician at Aultman for follow up regarding reports of dizziness and  fatigue and for an acute episode of asthma.  Tr. 478-480.  Diaz indicated that the onset of her asthma symptoms had been gradual over the prior two weeks and included dyspnea, wheezing, chest tightness, and a productive cough.  Tr. 478.  Diaz reported that her symptoms were relieved by use of her inhaler and nebulizer.  Tr. 478.  Diaz relayed that she had an appointment scheduled with her pulmonologist on November 19 and did not want to seek treatment at the emergency room for her asthma.  Tr. 478.  On examination, Diaz's respiratory

_____
[5] The August 27, 2012, record appears in the administrative record twice.  Tr. 535 and Tr. 593.

rate was 18 (unlabored) and her breath sounds were normal.  Tr. 478-479.  Diaz received a 5-day burst of oral steroids and was advised to go to the emergency immediately if she did not improve or if her symptoms worsened.  Tr. 479.  On November 19, 2012, Diaz saw nurse practitioner Skabar for follow up regarding her asthma.  Tr. 533-534.  Diaz relayed to Ms. Skabar that she was doing well with her Xolair injections but had an exacerbation earlier in the month that required a prednisone tapering burst from her primary care physician.  Tr. 533.  With respect to her injections, Diaz indicated she had some fatigue and body aches after her injections but stated that the benefits outweighed the side effects.  Tr. 533.  Diaz reported that she was continuing to wear her CPAP every night. Tr. 533.  Diaz noted that she had not received a new mask in over a year.  Tr. 533.  On examination, Diaz's respiratory rate was 16 and her O2 saturation on room air was 98%.  Tr. 533.  Diaz's lungs were clear with occasional expiratory wheezes.  Tr. 533.  Ms. Skabar's assessment regarding Diaz's asthma was that it was severe and persistent but under better control with the Xolair injections.  Tr. 533.  Ms. Skabar recommended continuing with the Xolair and keeping track of Diaz's exacerbations.  Tr. 533.  If Diaz required several bursts of prednisone during the year, Ms. Skabar indicated that they may increase the Xolair dosage.  Tr. 533.  Diaz was advised to follow up in 3 months unless she developed problems.  Tr. 534.  Ms. Skabar planned to look into getting a new mask and supplies for Diaz for the CPAP machine. Tr. 534.

On January 1, 2013, Diaz was admitted to the emergency room for an exacerbation of her asthma.  Tr. 588, 639-655.  Diaz presented to the emergency room with complaints of two days of shortness of breath that was sudden and progressive and worse on exertion.  Tr. 635.  Diaz indicated that she had been in contact with ill individuals the week prior to her emergency room visit.  Tr. 635.  Dr. Rudick was consulted during Diaz's admission and regarding her discharge.

Tr. 635.  She was discharged on January 3, 2013.  Tr. 635.  During her admission, Diaz showed marked improvement in her breathing and her respiratory rate at the time of discharge was 18 and she was not wheezing.  Tr. 635.  Her O2 saturation was around 96-98%.  Tr. 635.

On February 1, 2013, Diaz followed up with Dr. Rudick.  Tr. 532.  Diaz reported that she had been doing well since being home from the hospital.  Tr. 532.  On examination, Diaz's respirations were 14 per minute and her O2 saturation was 98% on room air.  Tr. 532.  Her lungs were clear to percussion and auscultation.  Tr. 532.  Dr. Rudick recommended that Diaz continue on her current medical regimen and follow up in about 3 months.  Tr. 532.

On April 2, 2013, Diaz was seen by Ms. Skabar with complaints of a cough.  Tr. 580-584.  Diaz complained of shortness of breath with exertion and more shortness of breath with rest.  Tr. 581.  She reported using the nebulizer six times each day.  Tr. 581.  On examination of Diaz's lungs, wheezing was observed along with coarse breath sounds throughout.  Tr. 581.  Diaz's O2 saturation was 98% on room air.  Tr. 582.  Ms. Skabar assessed Diaz as having an exacerbation of her asthma and prescribed prednisone and gave her a Kenalog injection.  Tr. 582.  Ms. Skabar also assessed acute bronchitis for which she prescribed a Zpak.  Tr. 583.  On April 23, 2013, Diaz returned to see Ms. Skabar for follow up regarding her exacerbation earlier that month.  Tr. 703-705.  Diaz stated she was feeling much better.  Tr. 703.  On examination of Diaz's lungs, Ms. Skabar observed clear breath sounds bilaterally to auscultation and percussion.  Tr. 704.  Diaz's O2 saturation was 98% on room air and her respiratory rate was 14 per minute.  Tr. 704.  Ms. Skabar noted that Diaz's asthma and bronchitis had improved and she recommended that Diaz follow up in 3 months.  Tr. 705.

During a February 18, 2014, follow-up visit with Dr. Rudick, Diaz reported that she had been tolerating her medication well and her respiratory status had been stable.  Tr. 757.  She

indicated, however, that she did not feel she was sleeping well even though she was using the CPAP. Tr. 757. She was using her inhaler about 3-4 times per day. Tr. 757. She was getting her exercise by walking three times per week. Tr. 758. On examination of Diaz's lungs, Dr. Rudick observed clear breath sounds bilaterally to auscultation and percussion. Tr. 758. Diaz's respiratory rate was 16 per minute and her O2 saturation was 98% on room air. Tr. 759. Diaz's conditions and medical regimen remained unchanged. Tr. 760. With respect to her complaints about her sleep, Diaz was instructed to complete a sleep diary. Tr. 760. Dr. Rudick recommended follow up in 3 months. Tr. 760.

### 2.    Opinion evidence

#### a.    Treating physician

On July 18, 2012, treating physician Alan Rudick, D.O., completed a questionnaire regarding Diaz's impairments. Tr. 256-258. Dr. Rudick indicated diagnoses of asthma (severe, persistent) and obstructive sleep apnea. Tr. 257. He listed dyspnea and wheezing as symptoms associated with Diaz's medical conditions. Tr. 257. Dr. Rudick indicated that Diaz's symptoms were stable and improved on her medication regimen, which included Albuterol, Symbicort, Singular, Zyrtec, and Xolair injections. Tr. 258. As far as limitations associated with her conditions, Dr. Rudick indicated that Diaz needed to avoid extremes of temperature and humid environments. Tr. 258. Also, he indicated that Diaz would need to avoid heavy lifting, bending or straining. Tr. 258.

#### b.    Consultative examining physician

On September 21, 2012, Steven Rodgers, M.D., conducted a consultative evaluation. Tr. 440-446. Diaz indicated that she had a 25-year history of asthma that had worsened over the prior 5 years, with increasing symptoms of shortness of breath and wheezing with less exertion.

Tr. 440.  Diaz reported having difficulty climbing stairs, walking more than 50 yards, and working in hot weather.  Tr. 440.  On examination, Diaz's lungs were clear to auscultation and percussion and there were no rales, rhonchi or wheezes.  Tr. 441.  Dr. Rodgers listed asthma as one of Diaz's conditions.  Tr. 442.  As far as Diaz's ability to do work-related activities, Dr. Rodgers opined that Diaz's ability to walk would be limited to 15 minutes per hour with no single episode of walking greater than 5 minutes and she should avoid working in the heat.  Tr. 442.

### c.  State agency reviewing physicians

On October 4, 2012, state agency reviewing physician Anton Freihofner, M.D., completed a Physical RFC Assessment, opining that Diaz had the following exertional limitations: occasionally lift/carry 50 pounds; frequently lift/carry 25 pounds; stand and/or walk about 6 hours in an 8-hour workday; and sit about 6 hours in an 8-hour workday.  Tr. 92.  Dr. Freihofner opined that Diaz had the following postural limitations: frequently climb ramps/stairs and occasionally climb ladders/ropes/scaffolds.  Tr. 92.  As far as environmental limitations, Dr. Freihofner opined that Diaz would have to avoid even moderate exposure to fumes, odors, dusts, gases, poor ventilation, etc.  Tr. 92.  Dr. Freihofner indicated that his RFC assessment was an adoption of the prior ALJ RFC dated May 24, 2012.  Tr. 92.

On reconsideration, on November 9, 2012, state agency reviewing physician Esberdado Villanueva, M.D., reached the same opinion as Dr. Freihofner regarding Diaz's physical RFC. Tr. 115-116.

## C.      Testimonial evidence

### 1.      Plaintiff's testimony

Diaz was represented at and testified at the administrative hearing.  Tr. 35-54.    The ALJ asked Diaz to explain why she felt she was unable to do any type of work.  Tr. 39.   In response, Diaz stated that it was because of her asthma.[6]  Tr. 39-40.  She explained that she had been admitted to the hospital for her asthma since her last hearing; she had to see her pulmonologist several times because of exacerbations; she uses her inhaler about four times each day and, if that does not work, she has to be near her nebulizer, which has to be plugged into an outlet.  Tr. 39-40.  The last time she had to go to the emergency room was in January 2013.  Tr. 40.  Diaz usually tries to go to her pulmonologist rather than the emergency room.  Tr. 40.  Diaz estimated seeing her pulmonologist twice in 2013 for exacerbations.  Tr. 40.

Diaz has two inhalers – a maintenance one and an emergency one.  Tr. 41.  She uses her maintenance inhaler twice a day and her other inhaler once a day.  Tr. 41.  Diaz first uses her inhaler and, if that does not work, she does a nebulizer breathing treatment.  Tr. 40.   She estimated doing a breathing treatment 4-5 times during the week or, on average, about once each day.  Tr. 40-41.  Diaz indicated that her breathing can be affected by the weather but she has not noticed a difference in the need to use the nebulizer based on a particular time of the year.  Tr. 41.  She indicated that everything can trigger her asthma.  Tr. 41, 42.  Diaz also takes pills for maintenance of her asthma and she indicated that her pulmonologist is considering surgery because she is on the maximum amount of medication and using her rescue inhaler more than she should.  Tr. 41-42.  She believes that the surgery that is being considered is called "bronchial plasty."  Tr. 42.

---

[6] She also indicated that her inability to work was related to her bladder problems.  Tr. 43, 51-54.

The ALJ asked Diaz whether her asthma impacted the last job that she worked at.  Tr. 42.
Diaz indicated that at her last job she was very active because she was in and out of the van and
building constantly and in and out of the weather a lot.  Tr. 42.  As a result, she was using her
inhaler a lot more.  Tr. 42.  Also, she did not have access to her nebulizer like she should have
while at work and had a few hospital stays while she was working. Tr. 42.

On a typical day, Diaz wakes up and takes her medication, sits and watches the news,
brushes her teeth, sits again for a little bit, and sometimes her mom will come over and do some
cleaning for her.  Tr. 46-48.  Her mom helps with the cleaning because dusting and vacuuming
will trigger her asthma.  Tr. 48.  Diaz has been getting Xolair injections for her asthma since
August 2010.  Tr.  47, 50.  She receives an injection every other Tuesday.  Tr. 47.  She is able to
drive but a friend usually drives her to those appointments.  Tr. 37, 47-48, 50.  Following her
injections, Diaz has a headache, her whole body aches and she is tired.  Tr. 47.   Diaz's children
are pretty self-sufficient and get to their extra-curricular activities by taking the bus or walking.
Tr.  49.  Her son plays baseball and her daughter runs cross-country.  Tr. 49.  She is not able to
attend their activities because they are outside and there is dust.  Tr. 49.  She tries to spend time
with her children at home, watching movies or helping them with their homework.  Tr. 49.   Diaz
enjoys sitting on the porch swing out front and tries to do that sometimes.  Tr. 49-50.  Diaz's
husband does the grocery shopping.  Tr. 50.

### 2.      Vocational Expert's testimony

 Vocational Expert Bruce Holderead ("VE") testified at the hearing. Tr. 54-61.  The VE
summarized Diaz's work history.  Tr. 55.  He indicated that Diaz had three different jobs.  Tr. 55.
First, she was a STNA – nurse's aide, which per the DOT (Dictionary of Occupational Titles) is
a nurse assistant, a semi-skilled, medium exertional job.  Tr. 55.  Next, she worked as a medical

assistant, a skilled, light exertional job.  Tr. 55-56.  Last, while she worked as a medical assistant, she was also performing work as a driver, transporting people.  Tr. 56.  The VE indicated that that work is classified as a semi-skilled, medium exertional job.  Tr. 56.

The ALJ asked the VE to assume an individual who could perform a range of medium exertional work with postural limitations of occasional climbing of ramps and stairs; occasional balancing, stooping, kneeling, crouching, and crawling; and no climbing ropes, ladders or scaffolds.  Tr. 56.  Also, the individual would need to have close proximity to a bathroom and would have to "[a]void concentrated exposure to humidity and wetness, extreme temperatures of hot and cold, as well as pulmonary irritants."  Tr. 56.  The VE indicated that the hypothetical individual could perform Diaz'a past work as a nurse assistant and medical assistant but not driver.  Tr. 56-57.  The VE also indicated that other jobs were available, including (1) dining room attendant, a medium, unskilled job; (2) coffee maker, a medium, unskilled job; and (3) linen room attendant, a medium, unskilled job.[7]  Tr. 57.

The ALJ then asked the VE what jobs would be available if the hypothetical was changed from medium to light exertional work.  Tr. 58.  The VE indicated that the following jobs were available: (1) cashier II, a light, unskilled job; (2) ticket seller, a light, unskilled job; and (3) office helper, a light, unskilled job.[8]  Tr. 58.  In response to further questioning by the ALJ, the VE indicated that, if the hypothetical individual required bathroom breaks every 30-60 minutes there would be no jobs available.  Tr. 58-59.  Also, if the individual required half hour bathroom breaks in the morning and afternoon consistently every other day, in addition to all other scheduled breaks, no work would be available to the individual.  Tr. 60.

---

[7] The VE provided national, state and regional job incidence data for the jobs identified.  Tr. 57.

[8] The VE provided national, state and regional job incidence data for the jobs identified.  Tr. 58.

### III. Standard for Disability

Under the Act, 42 U.S.C § 423(a), eligibility for benefit payments depends on the existence of a disability.  "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  Furthermore:

> [A]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy[9] . . . .

42 U.S.C. § 423(d)(2)(A).

 In making a determination as to disability under this definition, an ALJ is required to follow a five-step sequential analysis set out in agency regulations.  The five steps can be summarized as follows:

1.    If claimant is doing substantial gainful activity, he is not disabled.

2.    If claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

3.    If claimant is not doing substantial gainful activity, is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment,[10] claimant is presumed disabled without further inquiry.

4.    If the impairment does not meet or equal a listed impairment, the ALJ must assess the claimant's residual functional capacity and use it to determine if claimant's impairment prevents him from doing past relevant

---

[9] "'[W]ork which exists in the national economy' means work which exists in significant numbers either in the region where such individual lives or in several regions of the country."  42 U.S.C. § 423(d)(2)(A).

[10] The Listing of Impairments (commonly referred to as Listing or Listings) is found in 20 C.F.R. pt. 404, Subpt. P, App. 1, and describes impairments for each of the major body systems that the Social Security Administration considers to be severe enough to prevent an individual from doing any gainful activity, regardless of his or her age, education, or work experience.  20 C.F.R. § 404.1525.

work.  If claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

5.  If claimant is unable to perform past relevant work, he is not disabled if, based on his vocational factors and residual functional capacity, he is capable of performing other work that exists in significant numbers in the national economy.

20 C.F.R. §§ 404.1520, 416.920;[11] *see also Bowen v. Yuckert*, 482 U.S. 137, 140-42 (1987).

Under this sequential analysis, the claimant has the burden of proof at Steps One through Four.

*Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997).  The burden shifts to the

Commissioner at Step Five to establish whether the claimant has the RFC and vocational factors

to perform work available in the national economy.  *Id.*

## IV. The ALJ's Decision

In her April 24, 2014, decision, the ALJ made the following findings:[12]

1.  Diaz met the insured status requirement through June 30, 2012.  Tr. 16. The ALJ noted that this finding adheres to that of the prior decision. *Id.*

2.  Diaz had not engaged in substantial gainful activity since January 18, 2012.  Tr. 16.  The ALJ noted that this finding departs from that of the prior decision but only to the extent it reflects the alleged onset date for the present claim.  *Id.*

3.  Diaz had the following severe impairments: history of endometriosis and urinary incontinence, status-post interstim implant,[13] and asthma. Tr. 16-18.  The ALJ noted that this finding departs from that of the prior decision, in accordance with the evidence of record, and lack of evidence of a severe psychological impairment.  Tr. 16.

---

[11] The DIB and SSI regulations cited herein are generally identical.  Accordingly, for convenience, further citations to the DIB and SSI regulations regarding disability determinations will be made to the DIB regulations found at 20 C.F.R. § 404.1501 et seq.  The analogous SSI regulations are found at 20 C.F.R. § 416.901 et seq., corresponding to the last two digits of the DIB cite (i.e., 20 C.F.R. § 404.1520 corresponds to 20 C.F.R. § 416.920).

[12] The ALJ's findings are summarized.

[13] "InterStim II is a small device, which is surgically implanted to stimulate your sacral nerves with mild electrical pulses. The sacral nerves control your bladder and bowel. InterStim is used to treat overactive bladder, urinary retention, fecal incontinence and constipation." http://www.medtronic.eu/your-health/urinary-retention/device/what-is-it/index.htm (last visited 1/18/2017).

4.   Diaz did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments.  Tr. 18.  The ALJ noted that this finding adheres to that of the prior decision. *Id.*

5.   Diaz had the RFC to perform light work with the following limitations - occasional balancing, stooping, kneeling, crouching, crawling, and climbing ramps and stairs; no climbing ladders, ropes or scaffolds; work station must be in proximity to a bathroom; must avoid concentrated exposure to humidity, wetness, extremes of heat and cold, and pulmonary irritants, including dust, fumes, odors, gases, and poor ventilation.  Tr. 18-22.  The ALJ indicated that this finding departs from that of the prior decision, based on the evidence of record and Diaz's testimony.  Tr. 18-19.

6.   Diaz was capable of performing her past relevant work as a medical assistant (DOT 079.362-010).  Tr. 22-23.  The ALJ noted that this finding departs from that of the prior decision, based upon the VE testimony and his characterization of Diaz's past relevant work.  Tr. 22.

7.   Alternatively, although Diaz was capable of performing her past relevant work, the ALJ made findings at Step Five, concluding that there were other jobs in the national economy that, considering, Diaz's age, education, and work experience, Diaz could perform, including (1) cashier II (DOT 211.462-010); (2) ticket seller (DOT 211.467-010); and (3) office helper (DOT 239.567-010).  Tr. 23-24.

Based on the foregoing, the ALJ determined that Diaz had not been under a disability from January 18, 2012, through the date of the decision.  Tr. 24.

## V. Parties' Arguments

Diaz's argument pertains to the environmental limitations contained in the RFC and the ALJ's consideration of the opinions of state agency reviewing physicians Dr. Freihofner and Villanueva.  Doc. 15, pp. 7-10; Doc. 19.  She contends that the environmental limitations the ALJ included in the RFC did not adequately account for the severity of her respiratory condition and the ALJ did not satisfy the procedural safeguards in SSR 96-8p because the ALJ provided "some weight" to the state agency reviewing physicians' opinions but did not adequately explain

why the state agency reviewing physicians' environmental limitation of avoiding even moderate exposure to pulmonary irritants was not included in the RFC.  *Id.*

In response, the Commissioner argues that the ALJ adequately explained her findings regarding Diaz's respiratory impairment and a review of the decision makes clear the ALJ's reasoning for not fully adopting the state agency reviewing physicians' opinions.  Doc. 18, pp. 8-10.  The Commissioner further argues that, to the extent that the ALJ did not discuss the state agency reviewing physicians' limitation for respiratory irritants as extensively as she should have, any error is harmless because none of the jobs identified by the VE as being available to an individual with the limitations set forth in the RFC involve exposure to environmental conditions.  Doc. 18, pp. 10-11.  Also, the Commissioner notes that the state agency reviewing physicians did not conclude that Diaz had to avoid all exposure to pulmonary irritants.  Doc. 18, pp. 10-11.  Finally, the Commissioner argues that the ALJ's credibility determination was proper and supports the RFC environmental limitations.  Doc. 18, pp. 11-13.

## VI. Law & Analysis

### A.  Standard of review

A reviewing court must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record.  42 U.S.C. § 405(g); *Wright v. Massanari*, 321 F.3d 611, 614 (6th Cir. 2003).  "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992) (quoting *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).

The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)). Even if substantial evidence or indeed a preponderance of the evidence supports a claimant's position, a reviewing court cannot overturn the Commissioner's decision "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003). Accordingly, a court "may not try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility." *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).

**B.      The ALJ properly evaluated the opinions of the state agency reviewing physicians and accounted for Diaz's respiratory problems in the RFC**

Diaz contends that the environmental limitations in the RFC did not adequately account for the severity of her respiratory condition and the ALJ did not satisfy the procedural safeguards set forth in SSR 96-8p because the ALJ provided "some weight" to the state agency reviewing physicians without adequately explaining why the state agency reviewing physicians' environmental limitation of avoiding even moderate exposure to fumes, odors, dusts, gases, poor ventilation, etc., was not included in the RFC.

As non-examining reviewing physicians, Drs. Freihofner and Villanueva did not have ongoing treatment relationships with Diaz and therefore their opinions were not entitled to deference or controlling weight under the treating physician rule. *See Kornecky v. Comm'r of Soc. Sec*, 167 Fed. Appx. 496, 508 (6th Cir. 2006)*; Daniels v. Comm'r of Soc. Sec.,* 152 Fed. Appx. 485, 490 (6th Cir. 2005). It is the ALJ's responsibility to evaluate the opinion evidence using the factors set forth in 20 C.F.R. § 404.1527. *See* 20 C.F.R. § 404.1527(c). Those factors include (1) the length of the treatment relationship and the frequency of the examination, (2) the nature and extent of the treatment relationship, (3) the supportability of the opinion, (4) the

consistency of the opinion with the record as a whole, (5) the specialization of the source, and (6) any other factors that tend to support or contradict the opinion.  *Id.*

Although Drs. Freihofner and Villanueva were not treating physicians, the ALJ considered their opinions, including the environmental limitation to "avoid even moderate exposure" to fumes, odors, dusts, gases, poor ventilation, etc., and consistent with the Regulations explained the weight assigned to their opinions stating:

> Some weight was accorded the opinions of the state agency medical consultants, Anton Freihofner, M.D. and Esberdado Villanueva, M.D., that the claimant would be capable of work at the medium exertional level, could frequently climb ramps and stairs, occasionally climb ladders, ropes or scaffolds, and that she should avoid even moderate exposure to poor ventilation and pulmonary irritants. Drs. Freihofner and Villanueva each had the opportunity to examine the claimant's records, to which each cited liberally in support of their conclusions and each is well versed in the terminology and analytical framework employed in the disposition of these claims.  However, the presentation of the claimant during the hearing, combined with the imperative to resolve doubts in the claimant's favor, militates in favor of the exertional limitations as shown.

Tr. 22.

The ALJ concluded that the evidence supported an RFC with the following environmental restrictions:

> [T]he claimant must avoid concentrated exposure to humidity, wetness, extremes of heat and cold, and pulmonary irritants, including dust, fumes, odors, gasses and poor ventilation.

Tr. 18.

Diaz contends that the ALJ failed to adhere to the requirements of SSR 96-8p which states that, "If the RFC assessment conflicts with an opinion from a medical source, the adjudicator must explain why the opinion was not adopted."  1996 WL 374184, * 7 (July 2, 1996).   Assuming, without deciding, that the environmental limitations in the RFC conflict with the opinions of Drs. Freihofner and Villanueva such that the ALJ was required to explain why

the opinion was not adopted, the ALJ's decision is sufficiently explained and satisfies the procedural safeguards for evaluating opinion evidence.

Drs. Freihofner and Villanueva both indicated that their RFC assessments were an adoption of the earlier May 24, 2012, RFC.[14]  Tr. 92, 116.  However, as explained by the ALJ, "because of the introduction of evidence, new and material to the determination of disability, it is found that it would not be appropriate to be bound, in their entirety, by the [prior ALJ's] findings" (Tr. 14) and her RFC "finding depart[ed] from that of the previous decision, based on the evidence of record and the testimony of the claimant." (Tr. 18-19).   Thus, it is clear that the ALJ did not adopt the prior RFC assessment, which Drs. Freihofner and Villanueva had adopted, because she concluded that there was new and material evidence.

In considering the evidence and assessing Diaz's RFC, the ALJ discussed and considered in detail the medical record evidence concerning Diaz's asthma and considered and weighed the credibility of Diaz's allegations regarding the limiting effects of her respiratory condition.  Tr. 19-20.  As found by the ALJ, the evidence demonstrated generally normal objective pulmonary findings and testing as well as an overall good response to treatment, leaving Diaz's condition stable.  *Id.*  Furthermore, the ALJ considered Diaz's allegations regarding her respiratory symptoms, such as shortness of breath and wheezing, and concluded that Diaz's allegations were not entirely credible and her claim that her asthma would preclude all work was not supported by the record.  Tr. 19.  Diaz does not does not raise an independent challenge to the ALJ's

---

[14] The May 24, 2012, RFC assessment was:

> [F]rom February 20, 2010 through January 16, 2012, the claimant had the residual functional capacity to perform medium work . . . the claimant can frequently climb ramps and stairs, but she can occasionally climb ladders, ropes, and scaffolds; she should avoid exposure to fumes, odors, dusts, gases, poor ventilation, smoke, pollutants, and irritants . . ."

Tr. 71-72.

assessment of her credibility nor has she demonstrated that the ALJ's credibility determination is unsupported by the record.

Furthermore, while the ALJ's RFC assessment is not identical to the opinions of Drs. Freihofner and Villanueva, the Regulations make clear that a claimant's RFC is an issue reserved to the Commissioner and the ALJ assesses a claimant's RFC "based on all of the relevant evidence" of record. 20 C.F.R. §§ 404.1545(a); 404.1546(c).  It is the responsibility of the ALJ, not a physician, to assess a claimant's RFC.  *See* 20 C.F.R. § 404.1546(c); *Poe v. Comm'r of Soc. Sec.*, 342 Fed. Appx. 149, 157 (6th Cir.2009).  The ALJ "is not required to recite the medical opinion of a physician verbatim in his residual functional capacity finding [and] an ALJ does not improperly assume the role of a medical expert by assessing the medical and nonmedical evidence before rendering a residual functional capacity finding." *Id.* (internal citations omitted); *see also Coldiron v. Comm'r of Soc. Sec.*, 391 Fed. Appx. 435, 439 (6th Cir. 2010) ("The Social Security Act instructs that the ALJ—not a physician—ultimately determines a claimant's RFC").

Moreover, even where an ALJ provides "great weight" to an opinion, an ALJ is not required to adopt wholesale limitations contained therein. *Moore v. Comm'r of Soc. Sec.*, 2013 WL 6283681, * 7-8 (N.D. Ohio Dec. 4, 2013) (M.J. White) (even though the ALJ did not incorporate into the RFC all limitations from a consultative examiner's opinion that the ALJ assigned great weight to, the ALJ's decision was not procedurally inadequate nor unsupported by substantial evidence); *see also Smith v. Comm'r of Soc. Sec.*, 2013 WL 1150133, * 11 (N.D. Ohio Mar. 19, 2013) *affirmed*, 6th Cir. 13-3578 (Jan. 30, 2014) (ALJ not obligated to explain each and every limitation or restriction adopted or not adopted from a non-examining physician's opinion).

In this case, the ALJ did not ignore the opinions of Drs. Freihofner and Villanueva nor did the ALJ fail to explain the weight provided to their opinions. The ALJ provided "some weight" and incorporated environmental limitations into the RFC.[15]   The environmental limitations included in the RFC to address symptoms related to Diaz's asthma include limitations as to pulmonary irritants as well as limitations suggested by her treating pulmonologist Dr. Rudick regarding avoidance of temperature extremes.[16]  Tr. 18, 258.   For example, in the July 18, 2012, questionnaire Dr. Rudick completed regarding Diaz's conditions, Dr. Rudick indicated that Diaz needed to avoid extremes of temperature and humid environments (Tr. 258) and the RFC states that Diaz must avoid concentrated exposure to humidity, wetness, extreme heat and cold (Tr. 18).

Based on the foregoing, the Court finds that the ALJ sufficiently explained the weight assigned to the opinions of Drs. Freihofner and Villanueva and Diaz has failed to demonstrate that the environmental limitations contained in the RFC, although not identical to those included in the opinions of Drs. Freihofner and Villanueva, are not supported by substantial evidence.  *See e.g.*, *Moscorelli v. Colvin*, 2016 WL 4486851, * 4 (N.D. Ohio Aug. 26, 2016) (although the ALJ could have provided more clarity in his decision, the decision was sufficient to permit judicial review and the RFC was supported by substantial evidence).

Furthermore, the Court finds that error, if any, in including in the RFC a restriction that required Diaz to avoid concentrated exposure to pulmonary irritants rather including a restriction that required Diaz to avoid even moderate exposure to pulmonary irritants as set forth in the

---

[15] The ALJ included more restrictive exertional and postural limitations than those included in the opinions of Drs. Freihofner and Villanueva.  For example, the ALJ restricted Diaz to light rather than medium work; restricted Diaz to occasional climbing of ramps and stairs rather than frequent climbing of ramps and stairs; and found that Diaz could never climb ladders, ropes or scaffolds rather than being able to occasionally climb ladders, ropes or scaffolds. *Compare* Tr. 18 *with* Tr. 92, 116.

[16] Diaz does not raise a treating physician argument with respect to Dr. Rudick.

21

opinions of Drs. Freihofner and Villanueva was harmless because neither Diaz's past relevant work as a medical assistant nor other jobs identified by the VE – cashier II, ticket seller, office helper – require exposure to environmental conditions.  *See Dictionary of Occupational Titles* § 079.362-010, 1991 WL 646852  (medical assistant); § 211.462-010, 1991 WL 671840 (cahier II); § 211.467-010, 1991 WL 671848 (cashier-courtesy booth); and § 239.567-010, 1991 WL 672232 (office helper); *see also Hilliard v. Colvin*, 2016 WL 5415821, * 11-12 (W.D. Va. Sept. 27, 2016) (VE identified office helper (occupational code 239.567-010) as one of multiple jobs that did not require exposure to dust, odors, fumes and pulmonary irritants, which was consistent with more restrictive limitation contained in a medical opinion that the claimant argued the ALJ did not properly consider); *Washington v. Colvin*, 2016 WL 3632693, * 7-8 (D. Md. July 7, 2016) (finding ALJ's failure to explain whether limitations in physicians' opinions, including a requirement that the claimant avoid even moderate exposure to fumes, odors, dusts, gases, poor ventilation, etc., were adopted was harmless error because the jobs identified by the VE, one of which was office helper (occupational code 239.567-010),  could be performed by the claimant even if the ALJ had adopted the physicians' environmental limitation since the jobs had no environmental conditions); *Hindman v. Astrue*, 2012 WL 555432, * 8-9 (W.D. Ark. Jan. 18, 2012), *report and recommendation adopted* 2012 WL 555429 (W.D. Ark. Feb. 21, 2012) (ALJ's error harmless since cashier II position does not require exposure to airborne irritants, gases, fumes, dusts, odors or extreme heat or cold).

### VII. Conclusion

For the reasons set forth herein, the Court **AFFIRMS** the Commissioner's decision.


Dated: January 18, 2017

_____
Kathleen B. Burke
United States Magistrate Judge

22